DANIEL N. KATIBAH (293251)
 *dkatibah@nkllp.law*
JAMES C. NIELSEN (111889)
 *jnielsen@nkllp.law*
NIELSEN KATIBAH LLP
100 Smith Ranch Road, Suite 350
San Rafael, California 94903
Telephone:  (415) 693-0900
Facsimile:  (415) 693-9674

Attorneys for Plaintiff/Counterdefendant
Associated Industries Insurance Company, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| ASSOCIATED INDUSTRIES INSURANCE COMPANY, INC., a Florida corporation,<br><br>Plaintiff,<br><br>v.<br><br>SBE ELECTRICAL CONTRACTING, INC., a California corporation,<br><br>Defendant.<br><hr>SBE ELECTRICAL CONTRACTING, INC., a California corporation,<br>Counterclaimant,<br>v.<br><br>ASSOCIATED INDUSTRIES INSURANCE COMPANY, INC., a Florida corporation,<br><br>Counterdefendant. | No. 8:23-cv-00977-FWS-KES<br><br>**MEMORANDUM IN SUPPORT OF ASSOCIATED'S MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Date: 3/21/2024<br>Time: 10 a.m.<br>Room: 10D<br><br>Complaint Filed: 6/5/2023<br>Pretrial Conference: 10/31/2024<br>Trial: 11/19/2024<br><br>Hon. Fred W. Slaughter |

# **TABLE OF CONTENTS**

INTRODUCTION                                                                        1

PLEADED FACTS                                                                       3

1.      Associated's policies.                                                      3

2.      Palmer hires then fires SBE.                                                5

3.      Palmer and SBE take their fight to arbitration.                            6

4.      Associated declines to defend SBE.                                         8

5.      Palmer and SBE settle.                                                      8

6.      This lawsuit.                                                               9

DISCUSSION                                                                         10

1.      Rule 12(c) standards.                                                      10

2.      Relevant insurance standards.                                             11

3.      Associated is entitled to judgment on its pleadings because
        Associated owed no duty to defend SBE against Palmer's
        Arbitration counterclaims.                                                11

        A.      Palmer's counterclaims for SBE's substandard work and for
                Delayed occupancy damages involved no "property damage"
                as a matter of law.                                               11

        B.      Associated's faulty-workmanship exclusions precluded any duty
                to defend SBE against Palmer's remaining claim of water
                damage to the project's electrical switchgear.                    13

        *i.*    Exclusion j(5) barred coverage because Palmer's switchgear
                claims were for property damage caused by SBE's allegedly
                defective work at the parts of the project where SBE was
                performing operations.                                            14

ii.    The j(6) exclusion barred any duty to defend SBE because the switchgear is "that particular part" of the property Palmer expressly alleged "must be … replaced because" SBE's "work was incorrectly performed on it."    19

iii.    SBE's theory that it was legally innocent means nothing.    23

4.    Associated owes no duty to indemnify SBE's settlement with Palmer.    24

5.    Associated is entitled to judgment on SBE's pleadings because Associated owed no duty to defend or indemnify SBE.    24

CONCLUSION    25

# TABLE OF AUTHORITIES

## CASES

*A.S. Schulman Electric Co. v. State Board of Equalization*
49 Cal.App.3d 180 (1975)      14 (fn. 1)

*All Green Electric, Inc. v. Security Nat'l Ins. Co.*
22 Cal.App.5th 407 (2018)      23-24

*American Home Assur. Co. v. SMG Stone Co., Inc.*
119 F.Supp.3d 1053 (N.D. Cal. 2015)      12-13

*Ashcroft v. Iqbal*
556 U.S. 662 (2009)      10-11

*Buss v. Sup. Ct.*
16 Cal.4th 35 (1997)      24

*Cafasso v. General Dynamics C4 Systems, Inc.*
637 F.3d 1047 (9th Cir. 2011)      10

*Certain Underwriters at Lloyd's of London v. Sup. Ct.*
24 Cal.4th 945 (2001)      11-24

*Clarendon America Ins. Co. v. Gen'l Security Indem. Co.*
193 Cal.App.4th 1311 (2011)      passim

*Clegg v. Cult Awareness Network*
18 F.3d 752 (9th Cir. 1994)      10

*Colony Ins. Co. v. United Specialty Ins. Co.*
2022 WL 4597422 (C.D. Cal. 2022)      23

*Dworkin v. Hustler Magazine*
867 F.2d 1188 (9th Cir. 1989)      10

*Everett v. State Farm General Ins. Co.*
162 Cal.App.4th 649 (2008)      24-25

*Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*
896 F.2d 1542 (9th Cir. 1990)      11

*George F. Hillenbrand, Inc. v. Ins. Co. of North America*
    104 Cal.App.4th 784 (2002)                                              20

*Global Modular, Inc. v. Kadena Pacific, Inc.*
    15 Cal.App.5th 127 (2017)                                          passim

*Gonsalves & Santucci v. Greenwich Ins. Co.*
    634 F.Supp.3d 830 (C.D. Cal. 2022)                                   17-19

*Guebara v. Allstate Ins. Co.*
    237 F.3d 987 (9th Cir. 2001)                                           24

*F&H Constr. v. ITT Hartford Ins. Co.*
    118 Cal.App.4th 364 (2004)                                              1

*Letgolts v. David H. Pierce & Associates, PC*
    71 Cal.App.5th 272 (2021)                            2-3, 17-19, 22-23

*Maryland Cas. Co. v. Reeder*
    221 Cal.App.3d 961 (1990)                                           12-25

*Montrose Chem. Corp. v. Sup. Ct.*
    6 Cal.4th 287 (1993)                                                   11

*Norcal Gold, Inc. v. Laubly*
    543 F.Supp.2d 1132 (E.D. Cal. 2008)                                    10

*Regional Steel Corp. v. Liberty Surplus Ins. Co.*
    226 Cal.App.4th 1377 (2014)                                         12-13

*Scottsdale Ins. Co. v. MV Transp.*
    36 Cal.4th 643 (2005)                                                  11

*Thompson Pacific Constr., Inc. v. American Int'l Group, Inc.*
    183 F.Supp.3d 1047 (N.D. Cal. 2016)                                   4-5

*Trustees of Operating Engineers Pension Trust v. Tab Contractors, Inc.*
    224 F.Supp.2d 1272 (D. Nev. 2002)                                      10

## RULES & STATUTES

Fed. R. Civ. P. 8(a)                                                    10

Fed. R. Civ. P. 12(b)(6)                                               10

Fed. R. Civ. P. 12(c)                                                10-11

## OTHER MATERIALS

Croskey, et al., *Cal. Practice Guide: Insurance Litigation*
    (The Rutter Group 2023)                                            24

**INTRODUCTION**

Under longstanding California law, a "liability insurance policy is not designed to serve as a performance bond or warranty of a contractor's product." *F&H Constr. v. ITT Hartford Ins. Co.*, 118 Cal.App.4th 364, 373 (2004). Standard liability policy forms approved by the Department of Insurance embody this concept through exclusions j(5) and j(6)—commonly known as the "faulty workmanship exclusions"—which apply California courts' repeated admonition that an insured "contractor bears the risk of repairing or replacing [their own] faulty workmanship." *Clarendon America Ins. Co. v. Gen'l Security Indem. Co*., 193 Cal.App.4th 1311, 1325 (2011).

Here, SBE Electrical Contracting, Inc., was hired to do the electrical work for the construction of luxury apartments in downtown Los Angeles. The owner, Palmer Beaudry Avenue Properties LP, claimed SBE comprehensively made a hash of the electrical job. Among other things, Palmer claimed SBE failed in its contract duty to protect the project's switchgear—the bundle of switches, fuses, and circuit breakers installed by SBE to control the project's electrical system—from water intrusion. So midway through the project Palmer fired SBE and hired a different contractor. SBE claimed that Palmer owed millions for work already done and ended up in arbitration, where Palmer filed a counterclaim seeking many more millions.

SBE tendered Palmer's counterclaim to its commercial liability insurer, Associated Industries Insurance Company, Inc., which declined coverage on grounds that the damages sought by Palmer either did not amount to insurance-defined "property damage" to start with or were barred from coverage by the policy's faulty-workmanship exclusions. In response, SBE and Palmer entered into an inventive settlement whereby each side ostensibly agreed to pay the other millions but then agreed not to enforce the payments against each other and instead, by assignment, agreed that SBE alone would pursue Associated for Palmer's and SBE's stipulated but not paid "recoveries."

Meanwhile, Associated initiated this action to secure a declaratory judgment that Associated owed no defense or indemnity to SBE against Palmer's claims.  By its counterclaims for breach of contract and bad faith, SBE now seeks to recover the out-of-pocket sums it spent defending Palmer's counterclaims, and the sums that SBE and Palmer ostensibly, but not actually, agreed to pay each other.

Because SBE attached every document material to coverage as exhibits to its counterclaim, Associated now moves for a judgment on the pleadings under Rule 12(c).  This motion should be granted for two reasons.

<u>First</u>, the bulk of Palmer's claims against SBE were for substandard work that needed to be replaced.  Such claims fall outside the scope of commercial liability policies like Associated's in the first instance because they allege no insurance-covered "property damage" at all.

<u>Second,</u> Palmer's remaining claim for property damage in the form of water damage to the switchgear that SBE itself supplied, installed, and was supposed to protect from water—the only claim subject to the parties' settlement—is barred from coverage by the faulty-workmanship exclusions, which ensure "[t]he prospect of legal liability for poor work that helps deter builders from cutting corners" so as to avoid the "moral hazard" of "indemnifying [contractors] for the costs of fixing their own shoddy work."  *Letgolts v. David H. Pierce & Associates, PC*, 71 Cal.App.5th 272, 282-283 (2021) (construing provision identical to j(6) exclusion).

Courts have thus uniformly agreed that the faulty-workmanship exclusions bar coverage for claims of property damage attributed to the defective performance of an insured contractor in failing to protect its own work.  SBE's counterclaim asserts otherwise based on the lone case that it claims reached a different conclusion, *Global Modular, Inc. v. Kadena Pacific, Inc.*, 15 Cal.App.5th 127 (2017).  But later courts have confined *Global Modular*'s impact to its peculiar factual record, where the *Global Modular* court refused to apply the exclusions because no one had actually claimed the insured's failure to protect its work was either defective or a breach of its

contract.  Where, in contrast, there is no question that "the contractor's work was defective," *Global Modular* "is not pertinent" and the exclusions apply.  *Letgolts*, 71 Cal.App.5th at 285.

That is the setting here, where the only theory of property damage pleaded against SBE, and the only liability expressed in the settlement agreement, is for SBE's ongoing contractual failure to protect from rainwater the switchgear it had supplied and installed.  Associated's coverage does not apply and Associated is entitled to judgment on the pleadings.

## PLEADED FACTS

### 1.   Associated's policies.

Associated issued policies of primary and of excess liability insurance to SBE effective from July 18, 2020, through July 18, 2021.  (Dkt. 10, pp. 33, 164 [cover pages].)  Both policies are before the Court because SBE attached them as Exhibits A and B to its counterclaim (Dkt. 10) in this lawsuit.

The primary policy first states that Associated "will pay those sums that the insured becomes legally obligated to pay as damages" because of "property damage" caused by an "occurrence."  (Dkt. 10, p. 55.)  Associated owes a "duty to defend" against claims "seeking those damages," but "will have no duty to defend the insured against any 'suit' seeking damages for … 'property damage' to which this insurance does not apply."  (*Id*.)

The primary policy defines "property damage" as either "physical injury to tangible property, including all resulting loss of use of that property" or simply "loss of use of tangible property that is not physically injured." (*Id*. at p. 68.) An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (*Id*.)  A "suit" is defined to include "[a]n arbitration in which … damages are claimed," like the SBE/Palmer arbitration.  (*Id*.)

To describe when the insurance "does not apply" (Dkt. 10, p. 56), the policy

lists (among others) exclusions j(5) and j(6), which bar coverage for "property damage" to "[t]hat particular part of real property on which you or any subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations"—(j(5)—and to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it"—exclusion j(6).  (Dkt. 10, p. 58.)  "Your work" means both "[w]ork or operations performed by you or on your behalf" and "[m]aterials, parts or equipment furnished in connection with such work or operations." (*Id*. at p. 69.)  Exclusion j(6), however, expressly does "not apply to 'property damage' included in the 'products-completed operations hazard.' " (*Id*.)

Meanwhile, the term "products-completed operations hazard" means in relevant part " 'property damage' occurring away from premises you own or rent and arising out of 'your work' " except for "[w]ork that has not yet been completed or abandoned." (*Id*. at p. 69.)  This definition lists three scenarios in which SBE's "work" is "deemed completed":  when "all of the work called for in your contract has been completed;" when "all of the work to be done at the job site has been completed if your contract calls for work at more than one job site;" or when "that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project." (*Id*.)  When an insured contractor is fired midway through a job and a new contractor is hired to finish, the insured contractor cannot have "completed or abandoned" its work as a matter of law and the products-completed operations hazard cannot apply.  *Clarendon*, 193 Cal.App.4th at 1318-1319.

The follow-form excess policy, meanwhile, provides coverage on terms that "will follow the same provisions, exclusions and limitations that are contained in the applicable 'controlling underlying insurance.' " (*Id*. at p. 182; see *Thompson Pacific Constr., Inc. v. American Int'l Group, Inc.*, 183 F.Supp.3d 1047, 1050 n.2 (N.D. Cal. 2016) (noting that an excess policy that follows form "incorporate[s] the terms of the

primary policy"). "Controlling underlying insurance" refers to "the Declarations under the Schedule of 'controlling underlying insurance.' " (*Id.* at 186.) For general liability the Schedule lists the Associated primary policy. (*Id.* at 168.) The excess policy later provides that "the exclusions applicable to any 'controlling underlying insurance' apply to this insurance unless superseded by" new terms in the excess policy. (*Id.* at p. 183.) That is, all the terms from the primary policy discussed above are incorporated into the excess. We thus refer to the "policy" throughout this brief unless specifically noted.

**2.     Palmer hires then fires SBE.**

In 2019, Palmer as "Owner" and SBE as "Trade Contractor" entered into a contract for SBE to perform $25 million in electrical work at a project to build a luxury apartment complex, Ferrante, in downtown Los Angeles. SBE attaches the contract to its counterclaim as Exhibit C. (Dkt. 10, p. 223.)

Contract Paragraph 7 ("Materials") stated that SBE "shall order forthwith all materials, equipment and other items, which shall be required for the performance of the Work." (Dkt. 10, p. 225.) As SBE thus acknowledges in its counterclaim here, its "scope of work on the Project included the acquisition, provision, and installation of large switchgear units in the Main Electrical Room for the Project." (Dkt. 10, p. 8, ¶ 13.) Contract Paragraph 7 also made SBE "responsible for protecting and insuring its own tools and equipment and all materials stored on-site or off-site, from theft and other loss …." (*Id.*) That paragraph continued that Palmer "shall not be responsible for loss or theft of or damage to any of [SBE's] property or to any materials stored at the Project" except as a result of "the gross negligence or willful misconduct of" Palmer. (*Id.*)

Exhibit A to the contract, meanwhile, generally laid out "[t]he scope of work to be performed by" SBE. (Dkt. 10, p. 233, quoting "General Conditions".) Paragraph 8 said SBE "shall use all means necessary to protect material before, during, and after installation and to protect the installed work and materials of all

1    other trades.  In the event of damage, [SBE] shall make all repairs and replacements

2    necessary to the approval of [Palmer] at no additional cost to [Palmer]."  (*Id*.)

3         Exhibit D to the contract specified the scope of "Electrical" work at the

4    project.  (Dkt. 10, p. 239.)  Exhibit D Paragraph 29 required SBE to ensure its plans

5    for the job were sufficient "in order for them to supply and install a complete job,"

6    including subparagraph E dealing with "Switch gear and sub panels."  (*Id*. at p. 241.)

7    Exhibit D, Paragraph 41 then made SBE "responsible for all of [its] materials until

8    they are installed and accepted by" Palmer.  (*Id*. at p. 244.)

9         In March 2022, Palmer served SBE with a "48 Hour Notice/Notice of

10   Violation" letter (attached to SBE's counterclaim as Exhibit D) discussing abundant

11   deficiencies in SBE's work.  The letter warned that if each were not fixed within

12   three days, Palmer would "terminate the Agreement with SBE Electrical Contracting

13   immediately."  (Dkt. 10, p. 251.)  The letter also highlighted "SBE's negligence" in

14   having "allowed [the project's] switchgear to be exposed to water, which directly

15   caused what has so far been a four month delay in occupancy of the building."  (*Id*.

16   at 250.)  "The ongoing impact of SBE's negligence in this regard has yet to be

17   calculated, but it will be significant."  (*Id*.)

18        Four days later, Palmer fired SBE and hired another electrical contractor to

19   finish the job.  (SBE Counterclaim Exh. E, Dkt. 10, p. 254.)

20   **3.    Palmer and SBE take their fight to arbitration.**

21        Once fired, SBE "filed a lien on the Project in the amount of approximately

22   $3.2 million" for contract payments withheld by Palmer.  (Dkt. 10, p. 11, ¶ 27.)  A

23   few months later, SBE sued Palmer to foreclose on the lien.  (*Id*. at p. 12, ¶ 33.)

24   SBE's complaint "specifically notified the Court that the matter was subject to

25   arbitration" under the SBE/Palmer contract "and that the lawsuit was being filed

26   solely to preserve claims."  (*Id*.)  In December 2022, SBE filed a demand for

27   arbitration.  (*Id*. at p. 13, ¶ 38; see, e.g., Counterclaim Exh. G [demand].)

28        Palmer counterclaimed (Dkt. 10, p. 285, Exh. H), alleging that after Palmer

"terminated" SBE "from the construction project" Palmer had "incurred almost $11,000,000 in electrical installation costs, of which approximately $3,600,000 was spent fixing [SBE's] shoddy work and the rest spent completing what they left unfinished," meaning Palmer "collectively paid" SBE and its replacement "more than $4,000,000 over [SBE's] contract price …."  (Dkt. 10, p. 289, ¶ 2.)

"When all is said and done," Palmer claimed SBE would owe "at the very minimum $15,000,000."  (Dkt. 10, p. 290, ¶ 4.)  "The extraordinary costs to fix and complete" SBE's "work shows not only how badly they screwed up, but also how far over budget they were" and that "[h]ad [SBE] not been terminated and replaced, the project completion costs surely would have outstripped the Parties' contract price by tens of millions of dollars."  (*Id*. at ¶ 5.)

Palmer alleged that SBE's "work was well below par and its deficiencies so widespread that [Palmer] had little choice but to terminate for cause and replace [SBE] on the Project."  (Dkt. 10, p. 291, ¶ 12.)  "At the time of [SBE's] termination, nearly every unit bore defects."  (*Id*. at p. 292, ¶ 16.)  SBE "failed to properly install unit-level and building-level electrical equipment and has therefore delayed completion of the Project, as is detailed by the correction notices issues by the Los Angeles Department of Building and Safety."  (*Id*. at ¶ 17.)  Palmer claimed nearly every element of SBE's electrical work was done incorrectly and that it will need to "remov[e] drywall to install new circuits."  (*Id*. at ¶ 21.)

"Separately, [SBE] failed to protect the Project-level electrical equipment at the Property – the switchgear – from water damage."  (Dkt. 10, p. 293, ¶ 23.)  "The switchgear is located in the basement level of one of the buildings on the Property" (*id*. at ¶ 24) and "that switchgear was exposed to water through an unsealed hole in the deck above the switchgear room that [SBE's] employees drilled."  (*Id*. at ¶ 25.)  The parties' contract "allocates responsibility for the protection of the switchgear squarely with [SBE], regardless of where the switchgear is located or the stage of its installation" because the contract says SBE "is responsible for protecting and

insuring its own tools and equipment and all materials stored on-site or off-site" and that SBE "shall use all means necessary to protect material before, during, and after installation and to protect the installed work and materials of all other trades." (*Id*. at ¶ 26.) SBE admits in its counterclaim that its "scope of work … included the acquisition, provision, and installation of" the switchgear units. (Dkt. 10, p. 8, ¶ 13.)

According to Palmer, SBE's alleged "failure to protect the switchgear from water damage has caused extreme Project delays – the time to replace the switchgear caused at least a six month delay in occupancy of hundreds of apartments, and a concurrent extension of Respondent's construction loan carrying costs," on which "interest expense alone amounts to approximately $10,000,000 …." (Dkt. 10, pp. 293-294, ¶ 28.) Moreover, "Direct switchgear replacement costs amount to at least $900,000, separate and apart from" the "Project's completion and remediation costs described above." (*Id*. at p. 294, ¶ 29.)

Palmer's counterclaim thus prayed for general and punitive damages, interest, costs, and attorney's fees as required by the parties' contract. (Dkt. 10, p. 296.)

**4.   Associated declines to defend SBE.**

In March 2023, Associated disclaimed any duty to defend or indemnify SBE against Palmer's counterclaims. (Dkt. 10, Exh. I, pp. 300-312.) Associated expressly invoked the j(5) and j(6) exclusions described above. (*Id*. at p. 310.)

**5.   Palmer and SBE settle.**

Shortly after Associated's disclaimer, "SBE reached out to Palmer" to resume settlement talks. (Dkt. 10, p. 21, ¶ 68.) The parties accepted a mediator's proposal (*id*. at p. 22, ¶¶ 74-75) and SBE attached a copy of the settlement agreement to its Counterclaim here as Exhibit K.

The agreement's recitals describe the history of SBE's and Palmer's dispute— SBE's firing, its mechanic's lien lawsuit, and Palmer's arbitration claims of shoddy workmanship—before noting that Associated had filed this lawsuit. (Dkt. 10, pp. 325-326.) As "consideration" for the settlement (*id*.), the parties agreed that Palmer

would "pay" $2.75 million in contract proceeds SBE claimed were wrongly withheld and SBE would "pay Palmer the sum of" $9.4 million "solely in respect of the water damage to the switchgear and the damages flowing therefrom and not in respect of any other claims." (*Id*. at p. 327.)

The agreement described these combined sums as "the Settlement Amount," declared it "recoverable solely as against Associated," and explained that "neither Party shall pursue each other" to recover anything. (Dkt. 10, p. 327.)  Next, each party granted the other a "Mutual Release" of all claims at issue in SBE's mechanic's lien suit or in the arbitration. (*Id*.)  Palmer and SBE included a "Covenant Not To Execute" under which each party agreed to pursue any financial recovery "including the Settlement Amount, solely from Associated." (*Id*. at pp. 327-328.)  Palmer then assigned to SBE "all of its rights … to pursue the recovery of any of the Settlement Amount from Associated," including "any rights which Palmer may have under Cal Ins. Code §11580" (*id*.), which permits direct collection from a judgment debtor's liability insurer on the policy.  *Id*. at subd. (b)(2).  In other words, other than inventing SBE's supposed damages for its current counterclaim, Palmer and SBE walked away from their dispute.

Then, under the heading "Lawsuit Against Associated/Allocation of Recovery," the parties, having waived any right to recover from each other, created an ornate system to allocate recovery here. (Dkt. 10, p. 328.)  They agreed that SBE alone would seek the recovery by counterclaiming in this litigation, and that recovery would be allocated: 60% to Palmer and 40% to SBE for the first $1 million; 55% to Palmer and 45% to SBE for the second $1 million; a 50% split for the third million; 55% to Palmer and 45% to SBE for the fourth $1 million; and 67.5% to Palmer and 32.5% to SBE for "any sums in excess of" $4 million. (*Id*. at 328-329.)

**6.     This lawsuit.**

Associated filed its complaint for declaratory judgment that it owed no duty to defend or indemnify SBE as to the then-pending arbitration. (Dkt. 1.)  SBE

1  answered and counterclaimed, alleging two counts of breach of contract (duty to

2  defend and duty to indemnify the settlement) and for breaching the implied covenant

3  of good faith.  (Dkt. 10.)  Associated answered.  (Dkt. 14.)

4      Associated now moves for judgment on the pleadings under Rule 12(c).

5  **DISCUSSION**

6  **1.    Rule 12(c) standards.**

7      "After the pleadings are closed—but early enough not to delay trial—a party

8  may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  The pleadings are

9  "closed" under the rule "when the parties have filed all of the pleadings Rule 7(a)

10  contemplates."  *Norcal Gold, Inc. v. Laubly*, 543 F.Supp.2d 1132, 1135 (E.D. Cal.

11  2008).  The pleadings here are closed because Associated complained, SBE

12  answered and counterclaimed, and Associated answered.  This motion will not delay

13  the trial set to begin on November 19, 2024.  (Dkt. 16 [scheduling order].)

14      The principal difference between motions under Rule 12(b) and 12(c) is that

15  12(b) motions must be filed before answering, and 12(c) motions after all pleadings

16  are filed.  *Dworkin v. Hustler Magazine*, 867 F.2d 1188, 1192 (9th Cir. 1989).  That

17  aside, "Rule 12(c) is functionally identical to Rule 12(b)(6) and … the same standard

18  of review applies to motions brought under either rule."  *Cafasso v. General*

19  *Dynamics C4 Systems, Inc.*, 637 F.3d 1047, 1054 n. 4 (9th Cir. 2011).

20      Thus, like a Rule 12(b)(6) dismissal motion, a Rule 12(c) motion "is properly

21  granted when, taking all allegations in the pleadings as true, the moving party is

22  entitled to judgment as a matter of law."  *Trustees of Operating Engineers Pension*

23  *Trust v. Tab Contractors, Inc.*, 224 F.Supp.2d 1272, 1275 (D. Nev. 2002).  But the

24  Court is not "required to accept legal conclusions cast in the form of factual

25  allegations if those conclusions cannot be reasonably drawn from the facts alleged."

26  *Clegg v. Cult Awareness Network*, 18 F.3d 752, 755 (9th Cir. 1994).  After all, Rule

27  8(a) does not require detailed factual allegations but "it demands more than an

28  unadorned, the defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009).

Moreover, documents attached to a pleading and thus incorporated by reference are treated as part of the complaint when ruling on a Rule 12 motion. *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 (9th Cir. 1990). Here, as mentioned, SBE's counterclaim attached Associated's policies, the pleadings from the *Palmer* arbitration, SBE's contract with Palmer, SBE's settlement with Palmer, and the relevant claim correspondence. So SBE has placed every fact legally material to coverage before the Court through the pleadings, making resolution under Rule 12(c) unusually appropriate.

## 2. Relevant insurance standards.

A liability insurer must defend actions that raise a factual potential for liability that would be covered. *Montrose Chem. Corp. v. Sup. Ct.*, 6 Cal.4th 287 (1993). "Determination of the duty to defend depends, in the first instance, on a comparison between the allegations of the complaint and the terms of the policy" and may also involve extrinsic facts known to the insurer. *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal.4th 643, 654 (2005). Where "none of the claims is even potentially covered because it does not even possibly embrace any triggering harm of the specified sort within the policy period caused by an included occurrence, the insurer does not have a duty to defend." *Id.* at 655. In turn, "where there is no duty to defend, there *cannot be* a duty to indemnify." *Certain Underwriters at Lloyd's of London v. Sup. Ct.*, 24 Cal.4th 945, 958 (2001) (italics orig.).

## 3. Associated is entitled to judgment on its pleadings because Associated owed no duty to defend SBE against Palmer's arbitration counterclaims.

### A. Palmer's counterclaims for SBE's substandard work and for delayed occupancy damages involved no "property damage" as a matter of law.

Other than Palmer's claim for water damage to the project's switchgear (discussed within), Palmer's allegations against SBE asserted mere shoddy workmanship that needed to be fixed or redone. (See Dkt. 10 pp. 291-293, ¶¶ 13-22

1    [section titled "Claimant's Deficient Work"].)  Alleged deficiencies included "short

2    circuits" and "un-labeled lines," "[e]lectrical receptacles" that were not properly

3    "specified," "[i]ncorrect or absent grounding" and "wiring," "[c]rossed circuits," and

4    "[i]nverters out of place."  (*Id*. at p. 292, ¶ 21.)

5        These allegations mean nothing to coverage because "liability policies … are

6    not designed to provide contractors and developers with coverage against claims

7    their work is inferior or defective … [t]he risk of replacing and repairing defective

8    materials or poor workmanship has generally been considered a commercial risk

9    which is not passed on to the liability insurer."  *Maryland Cas. Co. v. Reeder*, 221

10   Cal.App.3d 961, 967 (1990).  SBE's shoddy work that predominated Palmer's

11   counterclaim was not insurance-covered "property damage" in the first instance and

12   could never have triggered a duty for Associated to defend SBE.

13       Palmer also alleged, of course, that some of SBE's bad work necessitated

14   "removing drywall to" redo the work properly.  (Dkt. 10, p. 292, ¶ 21A.)  But Palmer

15   did not allege that this caused damage to any other aspect of the project, i.e., the

16   work of other contractors.  And even if Palmer had so alleged, damage "claims for

17   demolition, repair, and lost use" that are "occasioned by the necessity of repairing

18   [the insured's] defective" work—sometimes called rip-and-tear damages—is "a risk

19   not covered by the CGL policy."  *Regional Steel Corp. v. Liberty Surplus Ins. Co.*,

20   226 Cal.App.4th 1377, 1393 (2014); e.g., *American Home Assur. Co. v. SMG Stone

21   Co., Inc.*, 119 F.Supp.3d 1053, 1060 (N.D. Cal. 2015) (rip-and-tear damage to

22   drywall and subfloor from removal of defective flooring not covered because

23   "remediation work does not constitute property damage under California law").

24       Finally, recall that Palmer claimed SBE's poor electrical work led to months-

25   long delays in occupancy at the building, thus costing Palmer millions of dollars.

26   Such claims do not implicate "property damage" under policies like Associated's.

27   See *American Home Assur. Co.*, 119 F.Supp.3d at 1051 ("mere delay in the

28   completion of the Project and sale of the residences does not constitute 'loss of use'

"); e.g., *Regional Steel*, 226 Cal.App.4th at 1393 (no property damage on a loss-of-use theory where "loss of use was occasioned by the necessity of repairing" defective work, i.e., "a risk not covered by the CGL policy").

    B.    <u>Associated's faulty-workmanship exclusions precluded any duty to defend SBE against Palmer's remaining claim of water damage to the project's electrical switchgear</u>.

Beyond damages for non-covered shoddy workmanship and delayed occupancy, Palmer's counterclaim sought liability against SBE for water damage to the project's electrical switchgear equipment that SBE had supplied and installed. According to Palmer, after installation SBE failed to protect the equipment—a duty expressly made part of SBE's "scope of work" under the contract—from rainwater intrusion, leading to the unit's malfunction, rejection by government inspectors, and eventual replacement. (Dkt. 10, p. 9, ¶ 17; pp. 293-294, ¶¶ 22-30.)

Such damage by a subcontractor to its own work implicates the j(5) and j(6) exclusions to the Coverage A insuring agreement, commonly known as the "faulty workmanship exclusions," which exist to ensure that a "contractor bears the risk of repairing or replacing [their own] faulty workmanship, while the insurer bears the risk of damage to the property of others." *Clarendon*, 193 Cal.App.4th at 1325. Exclusion j(5) applies to property damage to "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations."   Exclusion j(6), meanwhile, applies to [t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."

The *Clarendon* court confirmed that these exclusions apply only when the "products-completed operations hazard" does not apply, meaning the exclusions cannot apply after the insured completes its work.  But the *Clarendon* court also confirmed that a contractor fired from the job never completes its work and so

cannot invoke the exception to the exclusion.  In *Clarendon*, an insured general contractor was fired while building a custom mansion and the court concluded a terminated contractor cannot "complete" or "abandon" a project within the meaning of the products-completed operations hazard.  *Id*. at 1315.  The court thus analyzed the same faulty-workmanship exclusions that appear in Associated's policies and concluded both barred coverage for the homeowner's construction-defect lawsuit against the contractor.  *Id*. at 1325-1326.

Palmer fired SBE while the job was ongoing, so SBE never completed its work.  The exclusions are therefore relevant and we address each in turn.

> i.     *Exclusion j(5) barred coverage because Palmer's switchgear claims were for property damage caused by SBE's allegedly defective work at the parts of the project where SBE was performing operations.*

The *Clarendon* court held that an "insurer is not obligated to indemnify a policyholder for property damage that occurs while the insured is performing operations on that property," such that the "exclusion found in j(5) applies to works in progress."  193 Cal.App.4th 1325.  So where "the [owners'] claims encompassed property damage that occurred while [the contractor] or its subcontractors were performing operations on the property, no coverage would exist."  *Id*.

Under *Clarendon*, then, Palmer's claims for damage to the SBE-installed switchgear are excluded.  The damage occurred during SBE's "works in progress" because SBE had been terminated.[1]

The 2011 opinion in *Clarendon*, however, preceded the 2017 opinion in *Global Modular*, mentioned earlier.  The *Global Modular* court rejected the idea that

---

[1] Exclusion j(5)'s reach is limited to damage to "real property."  Items of electrical equipment installed into a building, like the switchgear, "constitute realty rather than tangible personalty" because of "their relatively permanent nature and their either being bolted to concrete foundations or imbedded in the land," making them "relatively immobile."  *A.S. Schulman Electric Co. v. State Board of Equalization*, 49 Cal.App.3d 180, 184 (1975).

the j(5) exclusion broadly "refers to works in progress," 15 Cal.App.5th at 137, without addressing *Clarendon*'s express finding that, indeed, the "exclusion found in j(5) applies to works in progress." 193 Cal.App.4th at 1325.  Focusing instead on the exclusion's phrase "are performing operations," the *Global Modular* court held that "the exclusion applies only to damage caused during physical construction activities," 15 Cal.App.5th at 137, by which the court meant damage that "occurred while the insured was physically present and working on the project at the time of damage." *Id*. at 138.

Read this way, *Global Modular* would imply that exclusion j(5) could not apply here unless SBE employees were on site at the project and working when water damaged the switchgear they had installed, even from rain in the wee hours of the morning.  SBE's counterclaim thus seizes on *Global Modular* to claim that the exclusion "requires … that SBE have actually been *performing* work on that 'particular part' of the property that was damaged *at the time it was damaged*, and that such damage *arise out of* those operations."  (Dkt. 10, p. 19, ¶ 58, italics orig.) SBE's counterclaim says nothing about *Clarendon*, which did not require the insured's employees to be on site and working at every moment of damage and thus, in concept, appears to conflict with *Global Modular*.

Fortunately this Court need not resolve the tension between those decisions to find that exclusion j(5) eliminated any duty for Associated to defend SBE *here.* Later decisions have limited *Global Modular* to its unique factual context.

 In *Global Modular*, the government hired contractor Kadena to build a VA rehabilitation center.  15 Cal.App.5th at 131.  Kadena hired subcontractor Global "to build, deliver, and install the 53 modular units that would comprise the rehabilitation center" and, "because Kadena had hired a different subcontractor to install the roofing, Global agreed to deliver the units covered only by a roof deck substrate—a three-fourths of an inch base sheet of plywood."  *Id*.  Delivery was delayed until the winter so that "the roofless units were exposed to the elements during the rainy

1  season, equipped with only a plywood substrate." *Id*. "Despite Global's efforts to

2  protect the units by covering them with plastic tarps, the interiors suffered water

3  damage;" the parties ended their contract; and Kadena then "oversaw the remediation

4  of the water-damaged interiors and completion of the project." *Id*.

5        Those facts, said the court, show that "this is not a garden variety case of an

6  insured seeking coverage for the costs of repairing its defective materials or poor

7  workmanship." *Id*. at 142. Instead, "Kadena contracted" with Global "for units

8  equipped with substrate only" and "[s]uch a product is not designed to withstand

9  heavy rains" so "Global's finished product was in actuality an unfinished product

10 awaiting a roof, the very thing that would have prevented the property damage." *Id*.

11 "This is simply not a case where an insurance company is being asked to foot the bill

12 for the insured's decision to use cheap or defective materials." *Id*.

13       Hence, the *Global Modular* court found the many cases (including *Clarendon*)

14 cited by Global's insurer "factually distinguishable" because they all "involve the

15 costs of replacing an insured's defective—as opposed to nondefective—work"

16 meaning that in the prior cases "the property damage … can truly be said to have

17 occurred because the contractor's work was *incorrectly performed*." *Id*. at 144, ital.

18 orig. In *Global Modular,* "on the other hand, we do not know whether Global's rain

19 protection was *defective* or simply *overcome by heavy rain*." *Id*. (italics added).

20       The trial record in *Global Modular* thus showed no defective work in the

21 insured's completed modular units, no discrete contractual duty to protect the units,

22 and no evidence that the insured's efforts to tarp the units in the face of rain were in

23 some way defective. The *Global Modular* court thus assumed for coverage purposes

24 that the units had been damaged by unusually heavy rain. Without evidence of that

25 any aspect of Global's work—manufacturing, installing, or even volunteering to

26 protect the units—was defective in the first instance, the exclusion in *Global*

27 *Modular* became irrelevant.

28       A later decision suggested *Global Modular* should be read narrowly for this

very reason.  In *Letgolts v. David H. Pierce & Associates, PC*, 71 Cal.App.5th 272 (2021), the court distinguished *Global Modular* as having turned on a "question about whether the contractor's work was faulty" or whether the protection was "simply overcome by heavy rain," rendering the case "not pertinent" in a setting— like here—where the theory of liability is that "the contractor's work was defective." *Id*. at 285.

Similarly, in *Gonsalves & Santucci v. Greenwich Ins. Co.*, 634 F.Supp.3d 830 (C.D. Cal. 2022), the court observed that *Global Modular* had found exclusion j(5) "inapplicable because the physical damage at issue in that case occurred in parts of the property not being worked on by the insured …," which is to say no one in *Global Modular* knew whether the insured had done any defective work.  *Id*. at 846. In contrast, the claims in *Gonsalves* were made against a subcontractor for causing delays and replacement costs after installing defective concrete-filled steel pipes (called "piles") at a new LAX airport concourse.  *Id*. at 834-835.  Because "all such property damage occurred to the [pipes] and the surrounding area on the concourse where [the insured] and its subcontractors were working … this exclusion would apply."  *Id*. at 845; e.g., *Clarendon*, 193 Cal.App.4th at 1325 (to the extent "the [owners'] claims encompassed property damage that occurred while [the insured contractor] or its subcontractors were performing operations on the property, no coverage would exist").  The court thus declined to apply *Global Modular*.

Likewise here, none of the damage addressed in Palmer's counterclaim involved "parts of the property not being worked on by" SBE within its scope of work.  Palmer claimed it spent "approximately $3,600,000 … fixing [SBE's] shoddy work" (Dkt. 10, p. 289, ¶ 2), *including SBE's failure to protect the switchgear from rainwater.  (Id*. at pp. 293-294, ¶¶ 23-33.)  SBE admits in its counterclaim here (*id*. at pp. 8-9, ¶¶ 13-15) that protection of equipment like the switchgear was its "work" under the SBE/Palmer contract, Exhibit A, which confirmed that "[t]he scope of work to be performed by" SBE "shall include … us[ing] all means necessary to

1    protect material before, during, and after installation and to protect the installed work

2    and materials of all other trades." (*Id*. at p. 233, quoting "General Conditions" and ¶

3    8.)

4         SBE's "work" under the contract thus included ongoing protection of installed

5    equipment like the switchgear, and thus mirrored SBE's "work" as defined in

6    Associated's policy to include "operations performed by you or on your behalf" and

7    "[m]aterials, parts or equipment furnished in connection with such … operations."

8    (Dkt. 10, p. 69 [def. no. 22].) According to Palmer, SBE's actual work included the

9    defective creation of an "unsealed hole in the deck above the switchgear room" that

10   allowed rainwater to intrude. (*Id*. at p. 293, ¶ 25.) That defective work also

11   implicated SBE's failure in its ongoing contractual duty to protect the switchgear.

12   (*Id*. at ¶ 23.) Palmer thus alleged SBE was contractually required to work on an

13   ongoing basis to protect the switchgear unless and until the work had been "accepted

14   by" Palmer, which never happened. (Contract Exh. D., ¶ 41 [Dkt. 10, p. 244].) At

15   all moments the switchgear was damaged by rain—even in hours of darkness—SBE

16   was negligently performing its ongoing duty to protect the switchgear.

17        Those claims thus differ from the claims in *Global Modular*, where no

18   evidence before the court suggested that the insured owed any duty to protect from

19   rainwater the modular units it had built and delivered, let alone improperly

20   performed such a duty. Later cases like *Letgolts* and *Gonsalves* have correctly

21   restricted *Global Modular*'s reach to the peculiar scenario created by its limited

22   factual record. Here, by contrast, Palmer alleged damage only to parts of the project

23   where SBE worked and claimed that SBE's ongoing contractually-mandated work

24   was faulty. On its own terms, then, *Global Modular* simply does not apply.

25        Nor have these later cases hesitated to enforce faulty workmanship exclusions

26   to claims like Palmer's alleging defective construction, consistent with the principle

27   that the "prospect of legal liability for poor work helps deter builders from cutting

28   corners" whereas "it would dull that discipline if contractors could obtain insurance

indemnifying them for the costs of fixing their own shoddy work." *Letgolts*, 71 Cal.App.5th at 282.  Even the *Global Modular* court hinted at such an outcome when it in distinguished cases like *Clarendon* as having "involve[d] the costs of replacing an insured's defective—as opposed to nondefective—work" such that "the property damage … can truly be said to have occurred because the contractor's work was incorrectly performed."  15 Cal.App.5th at 144, ital. orig.

At bottom, exclusion j(5) applies to damage to the "particular part of real property"—here, the switchgear—"on which [SBE] or any subcontractors … are performing operations"—including both SBE's negligent installation of the switchgear and SBE's ongoing but negligent contractual operations to protect the switchgear while SBE's electrical work continued.  (Dkt. 10, p. 58.)  That is what Palmer alleged against SBE and that is the basis on which the case settled.  *Letgolts*, *Gonsalves*, *Clarendon*, and, indeed, *Global Modular* itself, all can be properly read to support the conclusion that exclusion j(5) bars coverage in precisely such settings.

> ii.    *The j(6) exclusion barred any duty to defend SBE because the switchgear is "that particular part" of the property Palmer expressly alleged "must be … replaced because" SBE's "work was incorrectly performed on it."*

Exclusion j(6) applies to damage to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." (Dkt. 10, p. 58.)  The *Clarendon* court enforced the exclusion because "the claims asserted … were based on alleged 'defects and deficiencies' in the residence" the insured general contractor built "resulting from poor workmanship and/or materials."  193 Cal.App.4th at 1326.  The court did not specifically construe the exclusion's phrase "that particular part," but did decide that all the particular defects throughout the entire mansion project were excluded.  The *Clarendon* court thus viewed the whole project as subject to the exclusion, consistent with the rule that, "[i]n the case of a general contractor, all the work at the project is considered its

work product, whereas in the case of a subcontractor … only its portion of the work, such as siding, is the work product ….” *George F. Hillenbrand, Inc. v. Ins. Co. of North America*, 104 Cal.App.4th 784, 805 (2002).

Under *Clarendon,* then, all of SBE's allegedly defective work—including the switchgear and SBE's failed efforts to protect it—is subject to the exclusion. As such, none of Palmer's claims can be covered. As stated in *Clarendon*, the switchgear was a “part of the property that must be replaced because [SBE's] work was performed incorrectly.” 193 Cal.App.4th at 1326, italics added.

Without directly addressing *Clarendon*'s j(6) reasoning, however, the court in *Global Modular* decided “that the exclusion applies narrowly” and not “to the insured's entire project.” 15 Cal.App.5th at 139, 141. In reaching this conclusion, the *Global Modular* court acknowledged but did not reach the insured's view that its “waterproofing efforts” were not “incorrect work” within the exclusion because “the phrase refers to a product, such as warped or uneven floors, not a process like covering the units with plastic tarps.” *Id*. But “the jury was not asked to decide whether Global's waterproofing efforts were incorrect” (*id*. at 141) such that “we do not know whether Global's rain protection was defective ….” (*Id*. at 144.) The court therefore did not address the insured's contention that j(6) that the insured's operations themselves do not constitute “work.”

Here, by contrast, Palmer's counterclaim correctly alleged that protecting equipment like the switchgear was part of SBE's “work” under the contract, which SBE admits is true. (Dkt. 10, p. 8, ¶ 13.) Palmer claimed SBE's deficient performance of its protection work resulted in damage to the switchgear, which needed to be replaced. SBE's protection of equipment, not just equipment itself, falls within the scope of “work” contemplated in j(6) because policy defines the phrase “your work” to mean both SBE's “operations” *and* “equipment furnished.” (Dkt. 10, p. 69, def. no. 22.)

The argument by the insured in *Global Modular* that its “work” subject to the

1   exclusion is just a "product" and not a "process" would conflict with both the

2   SBE/Palmer contract and the policy's standard definition of "your work." Tellingly,

3   the *Global Modular* decision did not quote or address a definition of "your work"

4   employed in the policy there, if the term was used at all.  The court mentioned only

5   that, "assuming [the insured's] waterproofing efforts are incorrect work, the

6   'particular part' [the insured] performed the incorrect work 'on' was the plywood

7   substrate" covering the modular units, which the insured had tarped to keep rain out.

8   15 Cal.App.5th at 139.  The equivalent "work" here would, of course, be SBE's

9   failed efforts to protect the switchgear from water intrusion.

10          Having not decided that argument, the *Global Modular* court reasoned that the

11  "particular part" phrase "applies only to the particular component of the insured's

12  work that was incorrectly performed and not to the insured's entire project."  15

13  Cal.App.5th at 141.  The "particular part" there was thus merely "the plywood

14  substrate" built to underlay roofing to be installed on the modular units by another

15  contractor, "not the interior parts of the units for which Kadena sought

16  repair/replacement costs."  *Id*. at 139.  There was "no allegation" *those* protective

17  "items … were defective," and indeed "[t]hose items were acceptable until it rained

18  and they suffered water damage."  *Id*.  The exclusion thus could not be invoked to

19  bar coverage for the cost of their replacement.  *Id*.

20          As noted, however, nothing in the *Global Modular* record suggested that the

21  insured contractor there had any contractual duty to cover the modular units in the

22  first instance, and nothing about the units themselves was defective before they were

23  damaged, and the record there did not show that defective protection resulted in rain

24  damage.

25          Here, by contrast, SBE's "scope of work" under its contract included

26  protecting the switchgear it installed.  Palmer pursued claims against SBE for

27  performing that protection work on the switchgear deficiently and thus allowing

28  water to damage the switchgear.  *Global Modular* is thus off point under the court's

1    own reasoning.

2         Moreover, *Global Modular*'s reasoning likely was flawed.  The court's narrow

3    "component" reading of the phrase "that particular part" cannot align with

4    "rationale" of the faulty-workmanship exclusions "to "force contractors to bear

5    liability for their own defective work." *Letgolts*, 71 Cal.App.5th at 285.  *Letgolts*

6    confronted a proprietary "k(6)" exclusion identical to the j(6) exclusion appearing in

7    Associated's policy and similar to that in *Global Modular*.[2]  The *Letgolts* court cited

8    *Clarendon* for the proposition that "[t]he case law labels this a 'faulty workmanship

9    exclusion' " and commented that the "principle is simple.  The insurance company

10   says, 'Contractor, you are on the hook for your own bad construction work.  We are

11   not.' " *Id*. at 282.

12        The *Letgolts* court then discussed the unacceptable "moral hazard" of

13   permitting liability insurance to cover a contractor's substandard work, *id*. at 282-

14   284, and decided that the disputed "policy excluded [the claimants'] property claims,

15   which were the results of [the insured contractor's] own faulty workmanship" in

16   remodeling their home because "[t]he faulty workmanship exclusion"—the same as

17   j(6)—"meant these claims could not support a recovery against" the contractor's

18   insurer.  *Id*. at 284.

19        *Letgolts* then explicitly departed from *Global Modular*.  The court

20   acknowledged that *Global Modular* "interprets a faulty workmanship exclusion" but

21   called it an "irrelevant case" that merely "affirmed a summary judgment because

22   there was a fact question about whether the contractor's work was faulty,"

23   specifically quoting *Global Modular*'s admonition that " 'we do not know whether

24   Global's rain protection was defective or simply overcome by heavy rain.' " 71

25   Cal.App.5th at 285, quoting 15 Cal.App.5th at 144.  "Here, however, the contractor's

26   work was defective" so *Global Modular* "is not pertinent." *Letgolts*, 71 Cal.App.5th

27   

28   [2] As noted earlier, *Global Modular* does not include the key policy definitions.

1  at 285.

2      *Letgolts*, in other words, limited *Global Modular*'s holding—including as to

3  the "particular part" language also at issue in *Letgolts*—to its discrete factual record,

4  rendering it "not pertinent" in cases like this one where a contractor's defective work

5  is unambiguously the alleged basis of liability and settlement.  Under *Letgolts* and

6  *Clarendon*, Palmer's claims against SBE fell squarely within exclusion j(6) from the

7  beginning because "a contrary decision would … lessen[] the incentive for [SBE] to

8  exercise care or to make repairs at the least possible cost."  *Id*. at 284, cits. omitted.

9  No duty to defend existed here as a matter of law.

10      *iii.*    <u>SBE's theory that it was legally innocent means nothing.</u>

11      SBE's counterclaim admits that its scope of work under the contract with

12  Palmer included protecting the switchgear.  (Dkt. 10, p. 17, ¶ 55.)  Despite this, the

13  counterclaim alleges that SBE disputed Palmer's failure-to-protect theory on grounds

14  that SBE did nothing wrong.  According to SBE, "Palmer had never indicated *how*

15  SBE was allegedly negligent in its protection efforts" and had "fail[ed] to point out

16  any blameworthy conduct by SBE."  (*Id*.)

17      None of that matters.  Had SBE defeated Palmer's claim on the merits, no

18  judgment would have been entered to indemnify.  Coverage does not exist in the

19  first instance where the insured "would not have been liable at all, because it would

20  not have caused the damage.  There would be no liability, no claim, and thus, no

21  coverage."  *Colony Ins. Co. v. United Specialty Ins. Co.*, 2022 WL 4597422 * 3

22  (C.D. Cal. 2022), citing *All Green Electric, Inc. v. Security Nat'l Ins. Co.*, 22

23  Cal.App.5th 407, 414 (2018) ("Even if [the subcontractor] is technically correct that

24  its lack of negligence negates the … exclusion, it would not give rise to a duty to

25  defend because the lack of negligence would also negate [the contractor's]

26  liability.")

27      So here.  The only liability *alleged* by Palmer against SBE either did not

28

implicate "property damage" at all or was encompassed by exclusions j(5) and j(6) and thus outside of Associated's policies.  Any judgment would have been uncovered.  Had SBE defeated Palmer's claims, it would mean only that SBE "would not be liable to [Palmer] and there would be nothing to indemnify."  *All-Green Electric*, 22 Cal.App.5th at 414.  Either way, no duty to defend would exist.

**4.    Associated owes no duty to indemnify SBE's settlement with Palmer.**

"[W]here there is no duty to defend, there *cannot be* a duty to indemnify." *Certain Underwriters at Lloyd's of London v. Sup. Ct.*, 24 Cal.4th 945, 958 (2001), italics orig.  Associated owed no duty to defend Palmer's counterclaims so it owes no duty to indemnify SBE for the settlement.  The settlement, too, cements the lack of coverage.  The agreement dismissed with prejudice all of Palmer's counterclaims while confirming that SBE's liability was "solely in respect of the water damage to the switchgear and the damages flowing therefrom and not in respect of any other claims …." (Dkt. 10, p. 327 [section 1.b.].)  Because the switchgear claims are barred from coverage by exclusions j(5) and j(6), they cannot be "actually covered, in light of the facts proved." *Buss v. Sup. Ct.*, 16 Cal.4th 35, 45 (1997) (discussing duty-to-indemnify standard).  No coverage exists.

**5.    Associated is entitled to judgment on SBE's pleadings because Associated owed no duty to defend or indemnify SBE.**

Because Associated owed no duty to defend, SBE's first claim for breach of the duty to defend and second breach of the duty to indemnify necessarily fail.

SBE's third claim for tortious breach (bad faith) likewise fails.  An insured suing for bad faith "must show: (1) benefits due under the policy were withheld; and (2) the reason for withholding benefits was unreasonable or without proper cause." *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001).  Thus, where an insurer "did not breach the policy, it did not breach the implied covenant." Croskey, et al., *Cal. Practice Guide: Insurance Litigation* (The Rutter Group 2023), Ch. 12A-C, ¶ 12:45; e.g., *Everett v. State Farm General Ins. Co.*, 162 Cal.App.4th 649, 663

(2008) (if "there was no breach of contract, there was no breach of the implied covenant" as a matter of law).  Because SBE lacks any valid claim for breach of contract, Associated legally cannot be liable for bad faith.

## CONCLUSION

Policies of liability insurance "are not designed to provide contractors" like SBE "with coverage against claims their work is inferior or defective" because "[t]he risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk which is not passed on to the liability insurer." *Reeder*, 221 Cal.App.3d at 967.  Palmer made just such claims against SBE.  None was covered, either because they did not allege property damage in the first instance because of the faulty-workmanship exclusions.  Associated is entitled to judgment as a matter of law on all claims.

Respectfully submitted,

NIELSEN KATIBAH LLP

February 16, 2024

By: */s/ Daniel N. Katibah*
Attorneys for plaintiff/counterdefendant
Associated Industries Ins. Co., Inc.

# CERTIFICATE OF COMPLIANCE (LR 11-6.2)

The undersigned, counsel of record for Associated, certifies that this brief, including footnotes, is less than 25 pages long.  The undersigned notes in this regard that L.R. 11-6.1 was amended in 2023 to no longer permit a 25-page limit on moving and opposition briefs, but rather to impose a 7,000 word limit, which would result in a considerably shorter brief.  The undersigned also notes that the 2023 amendment to L.R. 11-6.1 permits different brief lengths "as otherwise … ordered by a judge …." In that vein, this Court's standing order (Dkt. 9) instructs parties to "read this order carefully" because "[i]t governs this case and differs in some respects from the Local Rules."  (*Id*. at 1.)  The order later directs parties that moving and opposition briefs "shall not exceed twenty-five (25) pages absent leave of court."  (*Id*. at 4:27-5:1.)

It is thus the understanding of Associated's counsel that this Court's standing order supersedes L.R. 11-6.1's 7,000 word limit and instead permits up to twenty-five pages of briefing for a party's moving or opposition papers.


NIELSEN KATIBAH LLP

February 16, 2024                      By:  */s/ Daniel N. Katibah*
                                       Attorneys for plaintiff/counterdefendant
                                       Associated Industries Ins. Co., Inc.